Filed 12/19/25  P. v. Whitlatch CA3
Opinion following transfer from Supreme Court CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C096642 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2019-0003141) |
| v. | |
| ANDREW WHITLATCH, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

In August 2018, when he was 16 years old, the defendant Andrew Whitlatch participated in a carjacking with another juvenile, K.N.  During the carjacking, K.N. fatally shot the victim.  The defendant had supplied K.N. with the gun.

The People filed a wardship petition in juvenile court.  Following a Welfare and Institutions Code section 707 hearing, the juvenile court transferred the defendant to the

1

jurisdiction of the criminal court. A jury found the defendant guilty of first-degree murder and carjacking.

On appeal, the defendant makes two arguments.

First, the defendant argues that we must remand the case for a new Welfare and Institutions Code section 707 hearing due to ameliorative amendments made to the law during the pendency of this action. The People agree, and remand on this point is required.

Second, the defendant argues there was insufficient evidence to show he demonstrated a reckless indifference to human life that was necessary to convict him of first-degree murder under the theory argued by the People below. With respect to this argument, this court previously affirmed the jury's verdict. Subsequently, our Supreme Court granted review and later transferred the case back to this court with directions to vacate our prior decision and reconsider the matter in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*).

We vacated this court's prior decision and the parties filed supplemental briefs. Defendant argues that under the guidance provided by *Emanuel*, there is insufficient evidence that he acted with reckless indifference to human life and his conviction must be reversed. The People distinguish *Emanuel* and continue to argue that substantial evidence supports a finding of reckless indifference.

Having reconsidered the second argument after considering *Emanuel*, we again affirm the jury's verdict.

FACTS AND HISTORY OF THE PROCEEDINGS

Facts

On August 15, 2018, J.D. worked at a Panda Express located in Stockton, California. He finished work at 1:46 a.m.

2

Videos taken from the area around the Panda Express show what happened in the next four minutes. First, J.D. approached his car, a gold Honda Accord. K.N., a juvenile, then approached J.D., pointing a gun. K.N. and the victim walked around the parking lot in the area of the car for a short time, then, after a little over a minute and a half, the defendant, then aged 16, walked into the view of the camera. J.D. looked like he was trying to leave and get away from K.N. and the defendant, and at one point, he flinched as if he had been hit in the head. Both K.N. and the defendant appeared to be blocking J.D.'s attempts to leave, including after J.D. flinched. Then, while both K.N. and the defendant were standing close to J.D., J.D. collapsed to the ground, and he remained motionless for the remainder of the video. The defendant then could no longer be seen in the videos, his actions perhaps blocked from view by a column. K.N. took something from J.D.'s pocket, probably keys to J.D.'s car, got in the car and drove off. Police officers arrived at the location of the shooting shortly before the videos' end. Throughout the videos, the red laser pointer for the gun is frequently on.

The defendant later told detectives he supplied K.N. with the gun that was used in the carjacking. A snapchat video captured approximately four hours before the incident shows defendant firing a handgun with a red laser pointer.

The officers who arrived at the area of the Panda Express found J.D. lying on the ground, unresponsive, not breathing, a pool of blood around his head, and a gunshot wound to his head. J.D. was transported to the hospital and pronounced dead; his death caused by a gunshot wound to his head. Officers found an expended .38 caliber (or .57 caliber) bullet in the area near the restaurant.

An officer with the Stockton Police Department later investigated the license plate number of the stolen car through a plate-reader system and learned the car had been scanned by readers four times between 3:05 and 4:36 a.m. in Sacramento.

3

At around 6:20 a.m., in Sacramento, officers patrolling an area in south Sacramento heard the sound of tires screeching and found the Honda crashed into a tree. The defendant had been doings "donuts" with the car in a parking lot when it crashed.

Officers arrested three people who had gotten out of the car, including the defendant, who had run from the area of the crash. They also detained a fourth person who appeared to have been on a bicycle. The other detained individuals included K.N., V.R., and R.W.

The defendant's backpack contained a gun holster. V.R.'s backpack contained a black Ruger LCR Revolver. A plastic baggie containing five live Speer .38 special bullets was found in the center console of the car.

The Stockton Police Department asked the Sacramento Sheriff's Department to help to arrange interview rooms for the four people who had been arrested or detained. Members of the Sacramento Sheriff's Department took the four to an interview facility and placed each in a separate interview room. It was possible for people outside the rooms to hear people in the rooms if they were yelling. The rooms were "monitored" and "recorded."

After leaving the Sacramento Sheriff's Office, and before they were booked at the Stockton Police Department, Stockton police officers took K.N. and the defendant to the hospital to have them medically cleared. An officer overheard K.N. say that he had held J.D. up at gunpoint for about 15 minutes while they argued about the victim giving up his car. K.N. said he shot J.D. when J.D. said the gun was not real. K.N. then mimicked how the victim fell.

Statements by the Defendant

The recording made of the detained parties speaking to each other and the interview between the defendant and detectives are of particular interest here.

4

<u>Recorded</u> <u>Conversation</u> <u>with</u> <u>K.N.</u> <u>and</u> <u>Witnesses</u>

Conversations the defendant, K.N., V.R., and R.W. had among themselves as they sat in separate interview rooms at the Sacramento Sheriff's Station were recorded.

During the conversations, the defendant told the others the homicide had been recorded on video and defendant said the gun was his.

K.N. said his prints would be found on the gun and ammunition when the detectives examined those items for prints.

When V.R. asked what a homicide is, the defendant answered, "a homicide is a murder." K.N. said, "[b]asically we just killed him and left him there on the scene." The defendant said, "[t]hat nigga was DOA."

The defendant said, "I told you, bruh, just let me do it, bruh, and you did not listen."

The defendant said, "[f]uck, bruh, we should not have killed that nigga, bruh." He said, "we didn't need to kill that nigga, bruh?" He said, "I told you, bruh. You should have just came when I told you to come, bruh."

K.N. said, "after I pistol whipped him, I shoulda' never shot him." The defendant responded, "[b]ruh, I thought that nigga was still alive, bruh." K.N. responded, "Cuddy, he's not. I'm sorry to say, but he's not." The defendant said, "I think that bruh is still alive, bruh." K.N. said, "I shot him in his head."

The defendant and K.N. acknowledged seeing the cameras and looking at them while the crime was happening. V.R. asked, "[w]hat the fuck did y'all think was gonna happen then?" The defendant responded, "[w]e thought that nigga was just gonna give us the car keys." He said, "[t]hat nigga wouldn't give us the car keys. What you mean, what happened after that? [¶] . . . (Unintelligible) started trying to walk around and shit over that little ass fuckin' Honda that he woulda' got back." K.N. said, "[h]e just kept tryin' to fuckin' walk away and I'm like bruh, just gimme the keys, bro. He woulda' told

5

em about our faces and we would have been on camera anyway and they would've started lookin' for us."

The defendant asked, "[m]an, bruh, why'd you have to (unintelligible) him, bruh? You could have hit him in the leg or somethin'. What happened to like, if he don't give it up, I'ma leg shot him? Remember that?" When K.N. asked, "[h]uh?" the defendant added, "Remember what we agreed on, nigga? We agreed if somebody don't give it up, nigga, we just gonna shoot them in the leg, nigga." K.N. responded, "I forgot, cuddy." The defendant asked, "[s]o, you just knocked that nigga's helmet off?" K.N. responded, "Cuddy, I forgot."

Detective Interview

Two detectives interviewed the defendant.

During the interview, the defendant said he only recently met K.N. and just knew him as "K."

Initially, when asked why he thought he was being interviewed, the defendant said he was doing donuts and crashed into a tree. At first, the defendant said he did not know whose car it was.

The defendant said he had read on a computer monitor while detained that the homicide unit was coming from Stockton.

The defendant said, "I didn't kill nobody."

After a bit, the detectives asked the defendant if he knew anything about the car getting stolen. The defendant said, "I didn't have nothin' to do with it. And I did not even want that person to get shot for it. Like, I really honestly did not want that person to get shot over a car. [¶] . . . [¶] That was uncalled for."

The defendant characterized the situation as escalating because J.D. refused to hand over the keys to the car. The defendant said, "I just remember just tellin' him just like, 'Leave it alone, bro. Just stop.' I'm like, 'He's done, bro. Don't – he's not fittin' to

give us the car. Come on.' And then, I left – I started leavin'. And then, I look back and I see the cop goin' this way." The defendant said, "[r]ight when I see the cop go this way, I heard, 'Pop!' And I looked – and I looked. I just took off runnin'."

The defendant suggested that at one point he tried to walk away from the conflict, but he returned to try to "calm" things down by trying to persuade J.D. to give up the keys to the car, "you seen me on the camera. 'Cause I was walkin' away. I walked back. . . . And I tell him like, 'Come on, bruh. Just give us the keys, bruh.' Like, I'm trying to calm him down. Like, 'Come on bruh, just give us the keys, bruh.' He's not trying to give us the keys. And then . . . he got pistol whipped. And he still didn't wanna give us the keys. So, I'm like, 'all right, fuck it. Come on.' "

The defendant said the victim had been crying and saying, " 'Don't do this. Please don't do this.' " The defendant tried to take the keys by grabbing a lanyard around J.D.'s neck. But he did not obtain the keys.

The defendant told the detectives that before the fatal shooting, he was moving to leave. He said, "[a]nd then, you see me start leavin' on the camera. And then, I – I turned around and come back. And then, I turned around 'cause I seen the police. And then, that's when I tried to tell him somethin', but . . ."

The defendant said when he saw the police, he was ready to start running, and the victim was already bleeding from the face. He thought K.N. was going to come behind him. But, according to the defendant, then he heard someone say, " 'Ah! Ah! Ah! Oh, yeah, get in' " the car.

The defendant repeated he was trying to get away from everything when he heard the gunshot. According to the defendant, when he saw the police, he began to run, then he heard a gunshot. Then he looked back and saw the victim on the ground and kept running. Then, K.N. picked the defendant up in the car.

<u>Procedural Background</u>

<u>Proceedings in the Juvenile Court</u>

The People filed a wardship petition in juvenile court that alleged defendant committed murder (Pen. Code, § 187); attempted second-degree robbery (Pen. Code., §§ 211 & 664); and carjacking (Pen. Code, § 215, subd. (a)).  The People also alleged that the principal was armed with a handgun as contemplated by Penal Code section 12022, subdivision (a)(1), during the commission of the alleged offenses.  In the petition, the People made a request for a transfer hearing to determine whether the defendant should be transferred to the jurisdiction of the criminal court under Welfare and Institutions Code section 707.  The juvenile court granted the request for transfer on March 5, 2019.

In considering the request for transfer, the juvenile court stated it was the burden of the People to prove by a preponderance of the evidence that there should be a transfer of jurisdiction to the criminal court.  In addition to other evidence, in making its ruling, the juvenile court considered the testimony of a forensic psychologist called by the defendant, the defendant's prior history of delinquency, the defendant's record of incidents while in juvenile custody before, and the defendant's prior performance in juvenile justice rehabilitation and drug treatment programs.

The juvenile court considered five criteria identified in Welfare and Institutions Code section 707, subdivision (a)(3), subparts (A)-(E), and found that the People had sustained their burden on four of the five criteria.  In analyzing the criteria, the juvenile court considered each of the factors identified by the statute for consideration in the evaluation of each criteria.  (Welf. & Inst. Code, § 707, subd. (a)(3)(A)-(E).)

Specifically, the juvenile court found the People had sustained their burden as to the first criterion, which looks to "the degree of criminal sophistication exhibited by the minor."  (Welf. & Inst. Code, § 707, subd. (a)(3)(A)(i.)  In finding the People had

8

satisfied their burden on this factor, the juvenile court wrote, "the court finds that [the defendant's] degree of criminal sophistication has increased over time, and that in the spectrum of the hundreds of [minors] that have appeared before this court, he is in the upper range. Instead of rehabilitating through the services offered to him over the past three or four years, [the defendant] has grown more criminally sophisticated during that time."

The juvenile court found the People had sustained their burden on the second criterion, which requires the court to consider "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." In considering this criterion, the court noted the forensic psychologist retained by the defendant had opined that the defendant had the ability to mature. The court said it agreed with the psychologist that the defendant's frontal cortex would continue to develop until he was 25 and that, consequently, "his abilities to make sound decisions and comprehend future consequences can improve." The juvenile court also stated that it believed that if the defendant was committed to the Division of Juvenile Justice "and engaged, really engaged, in the Division's evidenced-based programming, he might rehabilitate and become law abiding. . . . The problem, however, is that there is no evidence that [the defendant] will engage in those services."

The juvenile court continued, "[b]ased on the evidence presented, the court questions whether [the defendant] could be rehabilitated prior to the expiration of the juvenile court's jurisdiction even *if* he engaged in the rehabilitative services offered. The more pressing question is whether [the defendant] *will* engage in any of the services that would be provided to him through the juvenile court system, which includes [the Division of Juvenile Justice]. Unfortunately [the defendant] has a history of fighting against the juvenile court's efforts to rehabilitate him, and he lives his life the way he wants to. He has repeatedly and consistently shunned the help of the probation department, group homes, law enforcement, his social worker and the judges in the dependency and

9

delinquency courts.  Accordingly, the court projects that [the defendant] would not meaningfully engage in treatment provided by the juvenile court and, thus by logical extension, there is not enough time within the juvenile court's jurisdiction to rehabilitate him.  The court finds that there is no evidence or reason to believe that [the defendant] would engage in rehabilitation services offered to him."  (Fns. omitted.)  The court noted that the defendant had reported that he had attended treatment programs in three group homes and had claimed they were, " 'a bunch of nonsense.' "

The juvenile court found that the People had not sustained their burden on the third criterion, the "minor's previous delinquent history."  (Welf. & Inst. Code, § 707, subd. (a)(3)(C).)  However, in reaching this finding the juvenile court did consider incident reports covering the defendant's behavior during six periods in juvenile hall.  The court noted the portion of those incidents it identified in its ruling, "reflects [the defendant's] growing disdain for authority and his disregard for the rights and feelings of others.  His record of incidents in the Hall is the longest this court has seen."

The juvenile court found that the People had sustained their burden on the fourth criterion, which looks to the " '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor.' "  (Welf. & Inst. Code, § 707, subd. (a)(3)(D).)  The court wrote, "[t]he success of the dependency and delinquency courts' attempts to rehabilitate [the defendant] have been an utter failure to date, but that is neither due to a lack of effort by either court nor the adequacy of services provided him.  Unfortunately the old adage that 'you can lead a horse to water, but you can't make it drink' applies to this situation."  The court found the defendant "has refused to take advantage of the court's efforts to rehabilitate him and get him back to his mother. . . .  Some minors . . . have to be placed at several group homes before the 'right fit' is found, but many nevertheless complete their treatment.  Sadly for [the defendant] and the people he has impacted, [the defendant] has squandered multiple opportunities to rehabilitate."

10

The juvenile court found that the People had sustained their burden on the fifth criterion regarding the " 'circumstances and gravity of the offense alleged in the petition to have been committed by the minor.' " (Welf. & Inst. Code, § 707, subd. (a)(3)(E).)

In summarizing its findings, the juvenile court stated the defendant's "criminal sophistication has deepened over time, and he has repeatedly failed to comply with court orders and has resisted all court efforts to rehabilitate him. As such, his unwillingness to rehabilitate is a strong indicator that he would not rehabilitate under juvenile court supervision, including" if he is at the Division of Juvenile Justice. It added, "[h]is disdain for authority has grown over the years, and he has misbehaved on a consistent basis while in a custodial setting. His delinquent history, when combined with other factors, leads [us] to conclude [the defendant] is not likely to reform under juvenile court services." The juvenile court concluded, "[a]fter careful consideration of the evidence and foregoing criteria and factors, the court finds that [the People have] established by a preponderance of the evidence that [the defendant] is not a suitable candidate for treatment under the juvenile court system."

### Proceedings in the Criminal Court

The People filed an information on March 9, 2021, that charged the defendant with three counts. On the People's motion, the trial court later dismissed the second count, and the People filed an amended information realleging the first and third counts. The first remaining count charged the defendant with willfully, intentionally, and with malice aforethought murdering J.D. under Penal Code section 187, subdivision (a). The second remaining count accused the defendant of the carjacking of J.D. under Penal Code section 215, subdivision (a). Both counts included enhancement allegations that the principal in the commission of the offense was armed with a firearm as contemplated by Penal Code section 12022, subdivision (a)(1). Both counts also alleged that the

11

defendant was 16 years old or older at the time of the offense as contemplated by Welfare and Institutions Code section 707, subdivision (d)(1).

The jury found the defendant guilty of first-degree murder and carjacking. On both counts, the jury found true that the principal in the offense was armed with a firearm as contemplated by Penal Code section 12022, subdivision (a)(1).

The defendant filed a motion for a new trial, which the trial court denied.

On July 18, 2022, the trial court sentenced the defendant to 25 years to life on the murder conviction. The trial court stayed the enhancement punishment on the murder conviction under Penal Code section 654. The trial court sentenced the defendant to a determinate low term of three years for the carjacking, with a one-year enhancement for the Penal Code section 12022, subdivision (a)(1) finding, for a total of four years on the carjacking offense. The court also set fines at $10,000 under Penal Code section 1202.4 and at $10,000 under Penal Code section 1202.45.

The defendant filed a notice of appeal on July 21, 2022.

DISCUSSION

I

*Impact of Changes to the Statute Governing Transfer Hearings*

The defendant contends, and the People concede, that amendments to Welfare and Institutions Code section 707 adopted by the passage of Assembly Bill No. 2361 (2021-2022 Reg. Sess., Stats. 2022, ch. 330, § 1) (Assembly Bill 2361) apply retroactively, and remand is necessary so the juvenile court may conduct a new transfer hearing under a newly heightened standard. We must agree.

A.      Amendments to Welfare and Institutions Code Section 707

Welfare and Institutions Code section 707, subdivision (a)(1), allows prosecutors to move to have a minor that is 16 years or older transferred from the jurisdiction of a

12

juvenile court to criminal court when the minor is alleged to have committed one of a list of criminal offenses.  The enumerated offenses include murder and carjacking.  (*Id.* at subd. (b)(1) & (25).)  Once the prosecutor makes a motion, the court must order the probation officer to submit a report on the behavioral patterns and social history of the minor.  (*Id.* at subd. (a)(1).)

After the probation officer's report is submitted and the court considers "any other relevant evidence . . . the minor may wish to submit" the juvenile court must make its decision.  (Welf. and Inst. Code, § 707, subd. (a)(3).)  In making its decision, the court must consider the five specified criteria the juvenile court considered in this action: (1) the "degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) the minor's prior delinquent history; (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor."  (*Id.* at subd. (a)(3).)  If the juvenile court orders a transfer of jurisdiction to criminal court, "the court shall recite the basis for its decision in an order entered upon the minutes."

At the time of defendant's transfer hearing, the governing law and the corresponding rule of court required a petitioning prosecutor to establish by a preponderance of the evidence that "the minor should be transferred to a court of criminal jurisdiction." (Former § 707, subd. (a)(3), as amended by Stats. 2018, ch. 1012, § 1; Cal. Rules of Court, rule 5.770(a).)

Effective January 1, 2023, with Assembly Bill 2361 (2021-2022 Reg. Sess.), the Legislature amended section 707, adding the following language: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (Welf. & Inst. Code, § 707, subd. (a)(3), as amended by Stats. 2022, ch. 330, § 1, italics added.)  It also added a requirement that the

13

juvenile court's recitation of its basis for transferring a case to criminal court, "shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid.*)

We note three ways Assembly Bill 2361 changed the operation of Welfare and Institutions Code section 707.

First, the amendments raised the prosecution's burden from a preponderance of the evidence to clear and convincing evidence. (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284; *In re E.P.* (2023) 89 Cal.App.5th 409, 416.) " 'The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt.' (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998 []; see also Evid. Code, § 115.) ' "Clear and convincing" evidence requires a finding of high probability.' (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [], superseded by statute on another issue as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229–230 []; accord, Judicial Council of Cal., Civ. Jury Instns. (2023) CACI No. 201.) Courts have also described the standard 'as requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' (*In re Angelia P.*, at p. 919.)" (*In re S.S.*, *supra*, at p. 1286.)

"Second, under the previous version whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court was one of five factors for the court to consider in determining whether the case should be transferred to criminal court. The amendment states it as the ultimate question for the court to decide. Nevertheless, in deciding that question, the amendment requires the court to consider the same five factors listed in the previous version." (*In re E.P.*, *supra*, 89 Cal.App.5th at p. 416; see also *In re S.S.*, *supra*, 89 Cal.App.5th at p. 1286.) Among other things, this changed focus to rehabilitation "means courts must take care not to place too much

14

weight on the probation officer's 'report on the behavioral patterns and social history of the minor.' ([Welf. & Inst. Code,] § 707, subd. (a)(1).)" (*In re S.S.*, *supra*, at p. 1287.)

Third, "the previous version required that if the juvenile court orders a transfer, it shall recite the basis for its decision in the order. The amended statute requires the court to not only recite the basis for its decision, but also the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*In re E.P.*, *supra*, 89 Cal.App.5th at p. 416.)

Effective January 1, 2024, Senate Bill No. 545 (2023-2024 Reg. Sess.) further amended section 707, subdivision (a)(3). (Stats. 2023, ch. 716 § 1.) The amendments require courts, when evaluating the five criteria in subdivision (a)(3), to give weight to factors that previously were discretionary and to consider additional factors that had not been previously listed. (*Ibid.* [amending subdivision (a)(3)(A)-(E), including adding factors to criteria (A)(ii), and adding criteria (E)(iii)]; see also *In re J.M.* (2024) 103 Cal.App.5th 745, 752.)

B.    Retroactivity

We agree with both parties that the amendments to Welfare and Institutions Code section 707 effectuated by Assembly Bill 2361 apply retroactively to this case. As another panel of this court explained in *In re S.S.*, *supra,* 89 Cal.App.5th at pages 1288-1289, the amendments contained in Assembly Bill 2361 have "similar ameliorative effects to amendments made to section 707 by Proposition 57," which the voters passed in 2016, and "which prohibited prosecutors from charging juveniles with crimes directly in a court of criminal jurisdiction and gave the prosecution the burden of proof at transfer hearings. ([Welf. & Inst. Code,] § 707, former subd. (a)(1), as amended by Prop. 57 (Nov. 9, 2016) § 4.2; Evid. Code, § 500; see *People v. Superior Court* (*Lara*)[ (2018)] 4 Cal.5th [299,] 303.) Our Supreme Court held those amendments applied retroactively because they effectively reduced the possible punishment for juveniles: '[t]he possibility

15

of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment.' (*Lara*, at p. 303; see *In re Estrada* (1965) 63 Cal.2d 740 []; *People v. Francis* (1969) 71 Cal.2d 66 [].) . . .  Accordingly, we conclude the current version of [Welfare and Institutions Code] section 707 applies retroactively to minor's case, which is not yet final.  (*See People v. McKenzie* (2020) 9 Cal.5th 40, 45 [] [presumption of retroactivity ' " 'applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it' " '].)"

For similar reasons, the amendments effectuated by Senate Bill No. 545 also apply retroactively to this case.  (See *In re J.M.*, *supra*, 103 Cal.App.5th at pp. 752-753 [People conceded defendant's argument that Assembly Bill 2361 and Senate Bill No. 545 amendments applied retroactively, and this court agreed].)

C.      Necessity of Remand on this Record

Here, "[t]he juvenile court expressly applied the former preponderance of the evidence standard and directed its analysis to whether minor was 'fit for juvenile court,' not whether minor is 'amenable to rehabilitation while under the jurisdiction of the juvenile court.'  Though it applied the law in effect at the time, the juvenile court violated the . . . current version of section 707." (*In re S.S.*, *supra*, 89 Cal.App.5th at p. 1289.) Thus, under the retroactively applied amendments to Welfare and Institutions Code section 707, the juvenile court erred in how it reached its order to transfer the defendant to the jurisdiction of the criminal court.  (See *ibid.* ["We also agree with the parties that, applying the amendments to section 707 retroactively, the juvenile court erred in ordering minor's transfer"].)

16

The defendant argues, and the People agree, that considering this error, we must remand this case for a new transfer hearing in the juvenile court. Under the guidance of our Supreme Court's decision in *In re F.M.* (2023) 14 Cal.5th 701, 712-716, we agree.

At issue in *In re F.M.*, *supra*, 14 Cal.5th at page 704, was the application of Welfare and Institutions Code section 702, which requires that when a minor has been found to have committed a wobbler offense "the court shall declare the offense to be a misdemeanor or felony." In *In re F.M.*, the juvenile court had not complied with this statutory mandate. (*Id.* at p. 705.) In remanding the case for reconsideration, our Supreme Court held that an error under Welfare and Institutions Code section 702 "requires remand unless the record as a whole demonstrates that the juvenile court 'was aware of, and exercised its discretion' as to wobblers." (*In re F.M.*, *supra*, 14 Cal.5th at p. 705.) In so doing, the Court distinguished the juvenile court's error from those at issue in cases that had applied the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836, "[t]hat a 'miscarriage of justice' should be declared" and a reconsideration on remand required "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (See *In re F.M.*, *supra*, 14 Cal.5th at pp. 714-715.)

First, the court observed that the cases the People had cited to support the use of the *Watson* standard involved the sentencing of adults. (*In re F.M.*, *supra*, 14 Cal.5th at p. 715.) This distinction was not insignificant, as the Court had previously noted that Welfare and Institutions Code section 702's requirement that the court affirmatively declare the nature of the offense served the critical role of showing the juvenile court was "aware of, and actually exercises, its discretion." (*In re F.M.*, *supra*, 14 Cal.5th at p. 708.) The court had noted the awareness and exercise of this discretion comported with the specific functions of the juvenile court to protect the public and the minors under its jurisdiction, to preserve family ties when possible, and " 'to secure for the minor

17

custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents' ([Welf. & Inst. Code, § 202, subd. (a)])." (*In re F.M.*, *supra*, 14 Cal.5th at p. 708.) The Court noted that statutes applicable in the juvenile court context must be liberally construed to carry out these purposes. (*Ibid.*; see also Welf. & Inst. Code, § 202, subd. (a).)

Second, the Court observed that applying a *Watson* standard "does not address the risk of courts misapprehending the extent of their lawful authority in this particular context." (*In re F.M.*, *supra*, 14 Cal.5th at p. 716.)

Finally, the Court reasoned, "there is a practical difference in assessing the effect of an error when the court has not articulated whether a discretionary decision was made in the first place, as compared to when there were errors in a decision the court actually rendered. In the latter scenario, we may decline to remand because the record reflects aggravating circumstances so numerous that it would be 'inconceivable' that the trial court would 'impose a different sentence' absent the error. [Citation.] By contrast, where the concern is that no discretionary decision was made, attempting to discern the likelihood of a 'more favorable' decision is a more speculative inquiry. Instead of hypothesizing what decision the juvenile court would have made if it had understood the extent of its lawful authority, reviewing courts have consistently held that remand is appropriate in these circumstances. [Citation.]" (*In re F.M.*, *supra*, 14 Cal.5th at p. 716.)

Here too, we are considering the application of a statute applicable in juvenile courts to minor defendants. Thus, we are cognizant that our assessment of "the risk of courts misapprehending the extent of their lawful authority" in conducting a Welfare and Institutions Code section 707 hearing are informed by the same general policies that governed the Court's consideration of whether to remand the matter in *In re F.M.*, *supra*, 14 Cal.5th at page 716. Additionally, while here the record does reflect that the juvenile court did make a decision on the request, it did so under a version of the statute that had both a different focus *and* a lighter burden on the prosecutor. Trying to discern how the

18

juvenile court would have ruled under its current lawful authority would require speculation. In this circumstance, we find the better course would be to remand the matter to the juvenile court to consider this matter under the current statutory scheme.

II

*Substantial Evidence Supports the Verdict*

In a second argument, the defendant argues that his first-degree murder conviction must be reversed because there is insufficient evidence that he acted with reckless indifference to human life.

A.    Further Procedural Background

The jury was instructed with CALCRIM No. 540B regarding when a defendant can be found guilty of first-degree felony murder when a coparticipant in a crime has committed the act resulting in the victim's death. The instruction states that "[a] person *acts with reckless indifference to human life* when he knowingly engages in criminal activity that he knows involves a grave risk of death." The instruction also provides a list of factors the jury could consider in determining if the defendant acted with reckless indifference towards human life including if the defendant knew a lethal weapon would be present, if the defendant knew the weapon was likely to be used, if the defendant was near the person killed when the killing occurred, if the defendant had an opportunity to stop the killing or help the victim, the length of the crime, if the defendant knew of anything that might make the coparticipant likely to kill, and if the defendant did anything to minimize the possibility of violence.

The instruction stated that no one of the factors "is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life."

The prosecutor relied on the felony murder theories articulated in this instruction in making their closing argument for finding the defendant guilty on the murder charge.

19

They said they did not need to prove that the defendant intended for J.D. to be killed. The prosecutor argued, "[i]t doesn't matter that he says throughout the interview" with detectives that he "didn't want the victim to die. What we're saying here is that he knew that at the carjacking . . . by telling a 13-year-old to shoot a person in the leg" demonstrated "such [a] reckless indifference to human life that . . . he's liable for murder."

### B. Standard of Review

This court's role in reviewing a challenge to the sufficiency of evidence is limited. (*People v. Smith* (2005) 37 Cal.4th 733, 738.) When considering a claim of insufficient evidence, we examine the entire record to assess whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Thus, "we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Ibid.*)

### C. First-Degree Murder When Showing Reckless Indifference as a Coparticipant

Murder is the unlawful killing of another human being with malice aforethought. (Pen Code, § 187, subd. (a).) A murder that is committed during the perpetration of a carjacking is murder in the first degree. (Pen. Code, § 189, subd. (a).) A participant in a

20

carjacking who is not the actual killer may be liable if they were a "major participant in" the carjacking "and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (Pen Code, § 189, subd. (e)(3).) Penal Code section 190.2, subdivision (d), refers to a person who, "with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of" an enumerated felony, which can be carjacking, "which results in the death of some person or persons." (See also Pen. Code, § 190.2, subd. (a)(17)(L).)

"Reckless indifference to human life has a subjective and an objective element. ([*People v.*] *Clark*[ (2016)] 63 Cal.4th [522,] 617[(*Clark*)].) As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' ([*People v.*] *Banks*[ (2015)] 61 Cal.4th [788,] 801; see *Clark*, at p. 617.) As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).) 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. (*Banks*, at p. 808.) Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life. (*Ibid.*; see *Clark*, at p. 623.)" (*In re Scoggins* (2020) 9 Cal.5th 667, 677; see also *In re Bennett* (2018) 26 Cal.App.5th 1002, 1022.)

In *Clark, supra,* 63 Cal.4th at pages 618-623, our Supreme Court identified five "case-specific factors that this court and other state appellate courts have considered in

upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors to commercial armed robbery felony murders." (*Clark*, at p. 618.) The five factors included (1) the defendant's knowledge of weapons and the use and number of weapons, (2) the defendant's physical presence at the crime and opportunities the defendant had to restrain the crime or aid the victim, (3) the duration of the felony, (4) the defendant's knowledge of the cohort's likelihood of killing, and (5) the defendant's efforts to minimize the risks of violence during the felony (factors (1)-(5), collectively "the *Clark* factors"). (*Id.* at pp. 618-623; see also *In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The *Clark* court stressed that, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' (*Banks, supra,* 61 Cal.4th at p. 803.)" (*Clark*, *supra*, 63 Cal.4th at p. 618.) Thus, "the mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Ibid.*)

In *Emanuel*, the Court reversed a trial court's denial of a section 1172.6 petition on the grounds that there was insufficient evidence to support a finding that Emanuel acted with reckless indifference to human life during the commission of the underlying felony. (See *Emanuel*, *supra*, 17 Cal.5th at pp. 875, 885-895.) Section 1172.6 provides a procedural mechanism for persons previously convicted of murder under a less stringent standard to petition for resentencing. (*Emanuel*, at pp. 880-881.) In *Emanuel*, the parties and trial court relied on the original trial record to support their positions, and neither party presented new evidence. (*Id.* at p. 881.) That is, unlike here, the finding at issue on appeal was (1) based on the decision of a single judge—as opposed to that of a unanimous jury; and (2) not based on live witness testimony.

In *Emanuel*, the victim, Sonenberg, had agreed to sell a pound of marijuana to Emanuel and his codefendant Whitley. (*Emanuel*, *supra*, 17 Cal.5th at p. 876.) The parties arranged to meet near a public park shortly after 3 p.m. on a December afternoon.

22

(*Ibid.*) The evidence suggested that Sonenberg was sitting in his truck on a residential street abutting the park as the parties' confrontation unfolded. (See *id.* at pp. 877-878.) Emanuel's ex-girlfriend told police officers that Emanuel told her Sonenberg would not give up the marijuana; so, he started to walk away and said, "let's go." (*Id.* at pp. 878-879.) As Emanuel walked away, Whitley hit Sonenberg with a gun, then pointed the gun down at Sonenberg's leg. (*Id.* at p. 878.) Sonenberg hit Whitley's hand, causing the hand to go up, and Whitley pulled the trigger and shot Sonenberg in the neck. (*Id.* at pp. 878-879.) The truck lurched backwards, causing Sonenberg to fall from the passenger door of the truck. (*Id.* at p. 877.) Witnesses who heard gunshots dialed 9-1-1 and first responders discovered Sonenberg's body on the curb. (*Ibid.*) Sonenberg had texted Emanuel his location at 3:06 p.m., and the estimated time of the shooting was 3:15 p.m. (*Id.* at pp. 876-877.) Sonenberg died at the scene from a close-range gunshot wound. (*Id.* at p. 877.)

At the evidentiary hearing, the *Emanuel* trial court found "there was no evidence that, prior to the robbery, Emanuel knew Whitley was armed or likely to use lethal force. The trial court concluded that Emanuel should have acted to 'prevent' the shooting as the robbery unfolded, however, asking: 'What did he do other than, I'm out of here. Don't do that.' In the trial court's view, Emanuel 'created' the situation by participating in the robbery, and thus, had an affirmative obligation to do more than withdraw his aid and support from a murderous cohort." (*Emanuel*, *supra*, 17 Cal.5th at p. 881.) In the written decision denying the section 1172.6 petition, the trial court found proof beyond a reasonable doubt that Emanuel acted with reckless indifference to human life. The written order also emphasized that "Emanuel should have done more to prevent the shooting from happening." (*Ibid.*) The Court of Appeal affirmed, and the Court granted review. (*Ibid.*)

The *Emanuel* Court applied the *Clark* factors—combining factors (1) and (4) into one section of the analysis and adding a section to review "the totality of the

23

circumstances"—to determine if each factor as applied to the facts favored, did not favor, or was neutral to making a finding of reckless indifference. (*Emanuel*, *supra*, 17 Cal.5th at pp. 885-896.)

Here, we explain how *Emanuel* is factually different from this case and why we affirm the trial court's judgment here applying the *Clark* factors taking into account *Emanuel*'s analysis.

### D. Application to these Facts

Here, the evidence is sufficient to support a finding that the defendant consciously disregarded the significant risk of death his actions created: he supplied K.N. a gun, and he blocked J.D. from efforts to get away from the scene while K.N. aimed a gun at J.D.

### 1. Use of or Awareness of the Presence of Weapons and Knowledge of Cohort's Likelihood of Killing

In *Emanuel*, *supra*, 17 Cal.5th at page 885, the Court found factors (1) and (4) did not weigh in favor of finding Emanuel acted with reckless indifference. The Court noted the only gun used was used by Whitley. (*Ibid.*) The Court also quoted the trial court's express finding that " 'there was no evidence in the record demonstrating that, prior to the robbery, Emanuel knew Whitley possessed a gun, would bring that gun to the robbery, or "was likely to use lethal force." ' " (*Ibid.*)

In contrast, here, defendant may have been unarmed, but he supplied K.N. with the gun.

In advancing his argument, the defendant points to the discussions about having plans to shoot a victim in the leg if needed to secure the car and observes the defendant may have lacked the adult sophistication to appreciate that shooting someone in the leg could be lethal. But that discussion also demonstrates the defendant appreciated that the gun might be used. Indeed, it suggests that preliminary discussions between K.N. and the

24

defendant did not anticipate the two parties would back off if a potential victim would not give up a car. Instead, they contemplated engaging the use of a firearm.

Similarly, the defendant's statements that he knew he should have tried to carry out the carjacking instead of K.N. demonstrates an appreciation of the risk of equipping his younger coparticipant with a loaded gun. In total, these statements suggest that defendant both anticipated that the gun might be fired and understood that if he left K.N. to be the shooter, the result might be a gun shot that was more dangerous than the discussed shot in the leg. Thus, these factors support a finding that there was sufficient evidence to support the jury's finding that defendant acted with reckless indifference.

### 2. Duration of the Crime

In discussing factor (3), the duration of the crime, the *Emanuel* Court stated that a "lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence. 'Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. . . . Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" [citation], possibly culminating in murder.' (*Clark*, *supra*, 63 Cal.4th at p. 620, fn. omitted.)" (*Emanuel*, *supra*, 17 Cal.5th at p. 886.) The Court noted that the entire interaction between the *Emanuel* victim and defendants likely did not last more than 12 minutes. (*Ibid.*) It also noted that the portion of the transaction that consisted of the "violent confrontation" between Whitley and Sonenberg likely began when Sonenberg refused to give up the marijuana, the same point at which Emanuel had said " 'let's go.' " (*Ibid.*) Under these facts, the Court found this factor was "neutral" and "did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Ibid.*)

Here, defendant correctly notes this incident was shorter than the entire estimated length of the *Emanuel* incident. However, as the People correctly observe, here the

escalation of violence was not sudden, but the carjacking involved a drawn gun with a flashing pointed laser for the duration of the interaction.  While the length of this carjacking was not the extreme end of the spectrum of prolonged incidents contemplated by *Emanuel*, the length does not tip the balance of evidence such that we must conclude substantial evidence does not support the jury's verdict.  This factor, as in *Emanuel*, is neutral.  (*Emanuel*, *supra*, 17 Cal.5th at p. 886.)

3.      Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid Victims

With respect to factor (2), the *Emanuel* Court found that under the facts in that case, Emanuel's failure to prevent the shooting or aid the victim did not provide sufficient evidence of reckless indifference.  (*Emanuel*, *supra*, 17 Cal.5th at pp. 889-895.)  The Court quoted *Clark*'s explanation for the factor:  " 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force.  In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . .  [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' (*Clark*, *supra*, 63 Cal.4th at p. 619.)"  (*Emanuel*, at p. 889.)

The Court stated that Emanuel's failure to intervene when Whitley pulled out the gun was insufficient to support an inference of reckless indifference to human life.  (*Emanuel*, *supra*, 17 Cal.5th at p. 891.)  It wrote, "[w]e do not suggest that a rapidly unfolding crime may never allow for a finding of reckless indifference to human life.  But where a crime unfolds quickly, this factor—the failure to restrain a cohort—cannot be

26

said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so." (*Id.* at p. 892.)

The Court also found that Emanuel's fleeing the scene and failing to provide aid to the victim did not provide sufficient evidence of reckless indifference under the facts. (See *Emanuel*, *supra*, 17 Cal.5th at p. 893.) The Court reasoned, "[l]ooking at the instant case, we note that Emanuel had no meaningful opportunity to aid Sonenberg before the shooting. [Citation.] Where a defendant is aware of the risk of impending lethal violence, he or she may opt to aid the victims—for example, by permitting them to flee— rather than attempt to restrain his or her coperpetrator. Because there was no prolonged period of restraint or forewarning that Whitley would deploy lethal violence, Emanuel had no such opportunity. We further note that Emanuel took no actions after the shooting that might prevent or interfere with Sonenberg's ability to obtain or chances of receiving aid." (*Id.* at p. 894.)

The facts here are in marked contrast to *Emanuel*. The video shows that throughout the incident, K.N. has the gun pointed with the laser flashing at J.D. Rather than leaving the scene, defendant became increasingly involved in the moments leading up to the murder, blocking J.D. from getting away, not altering his course of conduct after K.N. pistol whipped J.D. Indeed, contrary to the defendant's representations to detectives, the video reveals that when J.D. was shot, the defendant was not well-engaged in the process of attempting to leave the scene and stop the violence. He remained near the victim when K.N. made the fatal shot.

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that

he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' (McCord, State Death Sentencing for Felony Murder Accomplices under the [*Enmund*] and *Tison* Standards (2000) 32 Ariz. St. L.J. 843, 873 (hereafter State Death Sentencing))." (*People v. Clark, supra,* 63 Cal.4th at p. 619, italics omitted.)

The defendant saw K.N. pistol whip J.D. By the defendant's account, J.D. was begging the parties to stop. He was sufficiently involved in the actual carjacking to know it was escalating and the video suggests he took no meaningful actions to stop the crime. Thus, the evidence demonstrated that, in this situation, the risk was of such a nature and degree that, considering the nature and purpose of the defendant's conduct and the circumstances known to him, its disregard involved a gross deviation from the standard of conduct that a law-abiding person would observe in the defendant's situation.

### 4.     Efforts Taken to Minimize the Risk of Violence

The *Emanuel* Court looked at decisions made during the planning phase of the crime when it considered factor (5), which looks at steps taken to minimize violence. (*Emanuel*, *supra*, 17 Cal.5th at pp. 887-889.) The Court quoted *In re Scoggins* observation that, " 'the commission of the crime during daylight hours in public view may have had the potential for minimizing violence . . . .' (See *Scoggins*, *supra*, 9 Cal.5th at p. 683 [although an unarmed assault and robbery contemplated the use of some violence, planning that it 'take place in a public parking lot during the daytime, when the possible presence of witnesses might reasonably be thought to keep [the defendant's] accomplices within the bounds of the plan' tended to minimize the risk of lethal violence].)" (*Emanuel*, at p. 887.)

28

In *Emanuel*, the Court concluded, "[h]ere . . . the trial court found the record does not contain evidence that Emanuel planned a robbery involving the use of weapons. Nor does the record contain evidence that Emanuel knew Whitley had a propensity for violence. Emanuel planned to participate in a robbery in a public location during daylight hours. The crime occurred in the open where witnesses might be present to observe from the park, passing vehicles, or nearby residences. This factor therefore does not support a finding of reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 887.)

In the matter before us the shooting took place shortly before 2 a.m., in a largely vacant parking lot. While there was a possibility of passing cars, the chances that they would catch a good glimpse of the carjacking was minimized by the darkness and time of day. Defendant knew the carjacking would involve a weapon. He gave K.N. the gun and even fired the gun in the hours before the incident. The conversations captured between defendant, K.N., and other persons detained for questioning reveal that defendant and K.N. had discussed using the gun if the victim did not give up the car. In short, while the facts in *Emanuel* suggested the robbery was planned in a way that minimized the chance of violence, the facts here do not paint that picture. This evidence supports the jury's guilty verdict.

### 5. Totality of the Circumstances and Defendant's Youth

In his supplemental brief, defendant urges us to consider defendant's youth in weighing the sufficiency of the evidence. Taking his youth into consideration, and looking at the *Clark* factors in total, defendant argues the evidence does not support a finding that defendant subjectively appreciated that his actions were likely to result in the taking of innocent life.

We disagree. Even taking the defendant's youth into consideration, the evidence was sufficient to support a jury's conclusion that defendant was " 'aware of and willingly involved in the violent manner in which the particular offense [was] committed,' and he

. . . consciously disregard[ed] 'the significant risk of death his or her actions create[d].' " (*Emanuel*, *supra*, 17 Cal.5th at p. 884.)  He provided K.N. with a loaded gun, they approached the victim in a largely empty parking lot near 2 a.m., they had discussed K.N. using the gun if the victim did not give up his car, and defendant helped prevent the victim from leaving as K.N. used a laser pointer to aim at J.D.

DISPOSITION

The judgment is conditionally reversed.  The matter is remanded to the juvenile court to conduct a Welfare and Institutions Code section 707 hearing pursuant to current law.  If the matter is transferred to a court of criminal jurisdiction, the criminal court is directed to reinstate the verdict and the sentence already imposed.


/s/
HULL, Acting P. J.


We concur:


/s/
RENNER, J.


/s/
FEINBERG, J.

30